[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-14908
Non-Argument Calendar
_____

D.C. Docket No. 5:13-cv-00344-CHW

VIRGINIA HUBBARD,

Plaintiff-Appellant,

versus

COMMISSIONER OF SOCIAL SECURITY,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Georgia
_____

(July 27, 2015)

Before WILSON, ROSENBAUM, and JULIE CARNES, Circuit Judges.

PER CURIAM:

Virginia Hubbard, proceeding *pro se*, appeals the district court's order

affirming the Social Security Commissioner's ("Commissioner") denial of

Hubbard's application for supplemental security income ("SSI") and disability insurance benefits ("DIB"). On appeal, Hubbard argues that the administrative law judge ("ALJ") failed to adequately consider her impairments in combination, erroneously found that she was not disabled, and improperly considered her past drug use. She also asserts that her condition continues to worsen. After careful review, we affirm.

## I.

Hubbard applied for a period of disability, DIB, and SSI in July 2010, alleging that she became disabled on April 10, 2010. Hubbard alleged that she was disabled due to third-degree burns, stroke, high blood pressure, degenerative disc disease of the cervical spine, a pituitary tumor, Sjogren's syndrome, rheumatoid arthritis, mitral valve prolapse, and asthma. After Hubbard's applications were denied initially and upon reconsideration, Hubbard requested a hearing by an ALJ.

A.    *Hearing Testimony*

At the disability hearing, Hubbard represented herself. The ALJ informed Hubbard of her right to have a representative and confirmed that Hubbard wished to proceed without a representative. When questioned by the ALJ, Hubbard testified that she was 47 years old, had an undergraduate degree in psychology, and had started but did not finish a master's program in criminology. Hubbard explained that she was not currently working and that she lived with her minor

2

daughter. According to Hubbard, she had attempted to work the previous year, 2011, as a hair braider but was unable to do so because her hands would "lock up" due to rheumatoid arthritis. Hubbard wore a brace on her arm at the hearing and explained that she did so because she had raked the yard the previous day, and the activity had caused her arm to hurt.

Prior to her burn injury in 2010, Hubbard testified, she was self-employed as a hair braider for several years. Before that, Hubbard worked a number of other jobs, including customer service and sales positions. She also worked as a phlebotomist and as a medical clerk in a hospital. Hubbard stated that she had problems with confusion, severe headaches, vision issues, nosebleeds, and seizures, which she believed were caused by a tumor on her pituitary gland. She also had back problems caused by a fall, for which she had surgery. According to Hubbard, she felt better after the surgery but still could not get up from the floor without assistance, could not bend frequently, and had trouble lifting things. Hubbard's daughter testified that Hubbard had trouble dressing and cooking for herself, and she reported that Hubbard also had memory problems.

Hubbard testified that she had used cocaine in the past to self-medicate but asserted that she was not an addict and that it only made her problems worse. The ALJ noted that the emergency-room records indicated that Hubbard had been smoking crack cocaine when she sustained her burn injuries, but Hubbard insisted

3

that she was not using cocaine on that occasion and that the doctor misconstrued what she had said. During the hearing, Hubbard stated that the burns had occurred when she lit a cigarette after pouring rubbing alcohol on herself to alleviate flea bites. Hubbard also admitted that she had used cocaine once earlier in 2012.

In addition, Hubbard complained that she had behavioral problems and became irritated easily. Hubbard further testified that she had suffered a stroke, sometimes had problems with drooling, and had headaches due to her tumor. She also expressed fear that she was going to die because of the tumor.

A vocational expert testified that an individual of the same age, education, and vocational background as Hubbard who was capable of work at the medium exertional level would be capable of performing Hubbard's past work as a hair braider, billing clerk, disc jockey, customer-service representative, phlebotomist, medical clerk, and sales representative, all of which involved sedentary to light work.

## B.    *Medical Records*

We review some of the pertinent medical records presented to the ALJ.

### 1.    Brain and Neurological Issues

On May 8, 2010, Hubbard went to the Medical Center of Central Georgia ("MCCG") Emergency Center complaining of slurred speech, right-arm pain and weakness, headache, and blurred vision. The doctor conducted a stroke evaluation

and determined that Hubbard had suffered a transient ischemic attack.[1]  The doctor suspected polysubstance abuse as a cause.  Doctors performed a computerized tomography ("CT") scan of Hubbard's brain, which appeared normal.  Hubbard underwent magnetic resonance imaging ("MRI") of her brain at a follow-up visit on August 24, 2010.  The MRI revealed some abnormalities in Hubbard's white matter, as well as a small lesion on her pituitary gland.

On September 7, 2010, Hubbard presented at the MCCG complaining of a chronic headache, and she was referred to a neurologist based on her previous MRI results.  On September 15, Hubbard had a CT scan of her pituitary area.  Based on the CT scan, the neurologist noted pituitary abnormalities that could be consistent with such a lesion, but could not confirm its presence.  Another CT scan on October 4, 2010, was normal.  An MRI the same day revealed some abnormalities in Hubbard's white matter, which were "common and nonspecific," as well as "shortening along the posterior pituitary," which was "of doubtful clinical significance."

In October 2010 Hubbard suffered an episode during which she felt very hot, passed out while walking to her car, and was unconscious for approximately ten minutes.  No cause for this episode is reflected in the medical records.

---

[1]  A transient ischemic attack, or "mini-stroke," is an acute episode of temporary neurological dysfunction that occurs when blood flow to a part of the brain stops for a brief time.

In February 2011, another CT scan of Hubbard's brain was taken after she developed a severe headache following a spinal tap. There were no changes from the CT scan in May 2010. Additional MRI brain scans in March 2011 showed a moderate degree of white-matter disease, which was unusual for a person of Hubbard's age. Compared to her August 2010 MRI, the white-matter lesions had increased only minimally, and her pituitary lesion had not changed significantly. On March 23, 2011, Hubbard underwent CT angiography ("CTA") of her head and neck, which revealed no evidence of an acute intracranial process.

On July 29, 2011, Hubbard went to the Emergency Center after suffering a syncopal (fainting) episode in a restaurant. In treatment notes, the treating physician included polysubstance usage (marijuana and cocaine) among the possible causes. A CT scan was also performed on that date, and it revealed no change from Hubbard's February 2011 CT scan.

On October 8, 2012, Hubbard went to the Emergency Center complaining of a worsening headache, which she attributed to a pituitary tumor. Hubbard was given pain medication, which relieved her headache, and she was released.

2.    Degenerative Disc Disease

On January 27, 2010, Hubbard underwent an MRI of the cervical spine, which revealed mild, multilevel degenerative disc disease of her cervical spine. On August 22, 2011, Hubbard presented at the MCCG with lumbar pain that had

6

lasted for six days and had also radiated down her leg.  Imaging revealed that Hubbard suffered from mild degenerative changes of the lumbar spine.  In December 2011, Hubbard underwent an MRI of her lumbar spine, which showed mild bulging discs at the L3-L4, L4-L5, and L5-S1 levels, as well as a possible cyst at the S1 nerve rootlet.  In April 2012, Hubbard had a lumbar CT scan, which found multilevel degenerative changes of the lumbar spine that were most prominent at the L3-L4, L4-L5, and L5-S1 levels.  Hubbard elected to proceed with operative intervention for her back pain, and, on July 27, 2012, underwent an L5-S1 hemilaminectomy and discectomy.  Treatment notes reflect that she tolerated the procedure well.

    3.    <u>Burn Injuries</u>

On April 10, 2010, Hubbard presented to the Emergency Center with significant burn injuries.  The treatment notes reflect that Hubbard poured rubbing alcohol over her body because she had developed a sensation of insects crawling on her skin as a result of smoking crack cocaine.  She then attempted to light a cigarette, and, in doing so, lit herself on fire.  Hubbard suffered second- and third-degree burns over 7% of her body.  While in the hospital, Hubbard underwent a psychological consultation.  The psychologist noted that Hubbard was anxious and

frustrated and diagnosed her with an adjustment reaction[2] with anxiety and frustration secondary to burn injuries.

Hubbard was transferred to a burn center for treatment. From April to July 2010, Hubbard had several follow-up visits for her burn wounds, and by July 19, Hubbard's wounds had fully healed, though she had developed a keloid scar over part of the wound.

4.    Chest Pain

In November 2009, January 2010, and August 2010, Hubbard went to the MCCG complaining of chest pain, dizziness, and shortness of breath. Subsequent testing generally found that her chest pain was not cardiac in nature. In January 2010, the treating physician suggested that the source of Hubbard's chest pain was inflammation of the cartilage that connects a rib to the breastbone. In August 2010, Hubbard was prescribed medication for a possible coronary spasm, though the doctor's notes indicate that such a spasm was "questionable." In October 2010, Hubbard underwent a transesophageal echocardiogram test, which revealed no cardiac source of emboli and trace to mild mitral and aortic valve regurgitation.

---

[2] A psychological adjustment reaction or disorder is the development of emotional or behavioral symptoms in response to a specific stressor.

5.    Asthma

Hubbard's medical records also revealed a history of bronchial asthma, for which she was on medication. At a January 27, 2010 doctor's visit, Hubbard was doing "quite well," and her condition was stable.

C.    *Other Evidence*

In October 2010, Dr. Robert Williams, a medical consultant, performed a physical residual functional assessment of Hubbard, based on his review of the evidence in Hubbard's file at that time. Dr. Williams opined that Hubbard's allegations of stroke and degenerative disc disease were not supported by evidence then in the record but that her allegations regarding her burn injury and high blood pressure were credible. He further opined that Hubbard had no significant limitations to her daily activities and was capable of performing medium work.

Dr. Michelle Wierson, a psychological consultant, conducted a psychiatric assessment of Hubbard in October 2010. Dr. Wierson opined that Hubbard suffered from an adjustment reaction with anxiety, as well as cocaine abuse or dependence. She further concluded that these impairments caused only a mild restriction of Hubbard's activities of daily living.

D.    *ALJ's Adverse Decision*

Following the hearing, the ALJ issued a decision finding that Hubbard was not disabled within the meaning of the Social Security Act. In the November 2012

9

decision, the ALJ concluded that Hubbard had the following severe impairments: status-post burn injury, bulging discs at L3-L4 and L4-L5, degenerative disc disease of the cervical spine, and status-post laminectomy and discectomy at L5-S1.  The ALJ determined that Hubbard's severe impairments, considered singly or in combination, did not meet or equal a listed impairment in the disability regulations.  In addition, the ALJ found that Hubbard had the residual functional capacity to perform medium work, with the exception that she should never climb ladders, ropes, or scaffolding.

After summarizing Hubbard's medical records and testimony about her symptoms, the ALJ concluded that, although Hubbard's impairments could reasonably be expected to cause the alleged symptoms, Hubbard's statements concerning the intensity, persistence, and limiting effects of those symptoms were not wholly credible.  The ALJ largely found that Hubbard's testimony was not supported by the medical evidence, which, according to the ALJ, showed the following:  Hubbard had not suffered seizures or a stroke;  her syncopal episodes may have been caused by drugs, rather than heart problems;  the lesion on Hubbard's pituitary gland was not a tumor, and no medical professional had opined that the lesion caused any limitations;  and there was no medical evidence that Hubbard had any difficulties or permanent limitations following her back surgery.

10

Moreover, the ALJ explained that Hubbard's overall credibility was undermined for two additional reasons:

> First, the claimant alleges that she does not have enough money to seek medical care, but she is able to afford crack cocaine, cigarettes, and marijuana.  It is discrediting that the claimant would chose [sic] to spend whatever extra money she does have on habits that are both illegal and cause her to have problems and feel bad, as she described at the emergency room presentation for her second syncopal episode.  Second, the claimant testified at the hearing that she continued to perform work, specifically braiding hair, after the alleged onset of disability. . . . Although the claimant did not apparently work at substantial gainful activity levels, the work activity itself indicates that she is not as limited as she has alleged.

Finally, the ALJ gave great weight to Dr. Williams's and Dr. Weirson's assessments of Hubbard's physical and mental impairments and also credited the testimony of the vocational expert.  Overall, the ALJ determined that Hubbard had the residual functional capacity to perform her past relevant work as a hair braider, billing clerk, customer service representative, phlebotomist, medical clerk, or sales representative in advertising, all of which involved sedentary to light work. Accordingly, the ALJ concluded that Hubbard was not disabled for purposes of receiving disability benefits.

E.    *Appeals Council Review and District Court Affirmance*

Hubbard requested review by the Appeals Council, and she submitted additional medical evidence from 2013.  The Appeals Council denied review,

11

stating that the medical records were for a later period of time than that covered by the ALJ's decision, a period that ended November 30, 2012. Hubbard then filed a *pro se* complaint for review in federal court. She consented to proceed before a magistrate judge, *see* 28 U.S.C. § 636(c)(1), and submitted numerous medical records, some of which had been submitted to the ALJ or Appeals Council and others that were new and post-dated the ALJ's decision. The magistrate judge affirmed the Commissioner's final decision, and Hubbard now brings this appeal.

## II.

In Social Security appeals, we review whether the Commissioner's decision is supported by substantial evidence and based on proper legal standards. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.* (internal quotation marks omitted). We must affirm the agency's decision if it is supported by substantial evidence, even if the evidence preponderates against it. *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Our deferential review precludes us from deciding the facts anew, making credibility determinations, or re-weighing the evidence. *Winschel*, 631 F.3d at 1178. "[C]redibility determinations are the province of the ALJ, and we will not disturb a clearly articulated credibility finding

12

supported by substantial evidence." *Mitchell v. Comm'r of Soc. Sec.*, 771 F.3d 780, 782 (11th Cir. 2014) (citations omitted).

### III.

The individual seeking Social Security disability benefits bears the burden of proving that she is disabled. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). The applicable regulations provide a five-step, sequential evaluation process to determine whether a claimant is disabled. *Winschel*, 631 F.3d at 1178. As part of this process, the ALJ must analyze whether the claimant: (1) is currently engaged in substantial gainful activity; (2) has a severe, medically determinable impairment or combination of impairments; (3) has an impairment, or combination thereof, that meets or equals the severity of a specified impairment in the Listing of Impairments; (4) can perform any of her past relevant work, in view of her residual functional capacity; and (5) can make an adjustment to other work, in view of her residual functional capacity, age, education, and work experience. *See id.*; 20 C.F.R. § 404.1520(a)(4). In determining the claimant's residual functional capacity, the ALJ must consider all of the alleged impairments, both severe and non-severe. 20 C.F.R. § 404.1545(e).

### A.

Here, substantial evidence supports the ALJ's determination that, despite her combination of impairments, Hubbard had the residual functional capacity to

perform her past relevant work. First, the record demonstrates that the ALJ properly considered all of Hubbard's symptoms and alleged impairments, both severe and non-severe, in determining her residual functional capacity. *See* 20 C.F.R. § 404.1545(e). At the third step, the ALJ stated that no medical expert had "opined the claimant's impairments, considered singly or in combination, are equivalent in severity to the criteria of any listed impairment," nor did the evidence show a contrary conclusion. *See Jones v. Dep't of Health & Human Servs.*, 941 F.2d 1529, 1533 (11th Cir. 1991) (stating that the ALJ's statement that she considered the combination of impairments is adequate to show such consideration). Further, the ALJ stated that she considered "all symptoms" in assessing Hubbard's residual functional capacity at the fourth step, and she then reviewed the medical evidence and hearing testimony regarding the alleged impairments, including the non-severe impairments. In sum, the ALJ's decision shows adequate consideration of the combined effect of Hubbard's impairments. *See id.*; *see also Wilson v. Barnhart*, 284 F.3d 1219, 1224-25 (11th Cir. 2002).

Furthermore, the medical evidence supports the ALJ's findings regarding Hubbard's alleged symptoms and impairments. Despite Hubbard's claims that she had suffered a stroke and had a tumor on her pituitary gland, the objective medical evidence showed that Hubbard had suffered a transient ischemic attack and had a pituitary lesion that did not reflect any "overt tumor problem." No doubt these are

14

still serious matters, but the medical records did not indicate any functional limitations related to those conditions. Additionally, Hubbard's CT scans consistently returned normal results, and doctors suspected that polysubstance abuse may have been a contributing factor with regard to Hubbard's transient ischemic attack and at least one of her syncopal episodes.

With regard to her burn wounds, Hubbard's medical records showed that the burns had healed well and fully, and they did not indicate any lasting limitations as a result of her injury. Moreover, although Hubbard suffered from anxiety secondary to her burn wounds, no significant mental-health limitations were noted by the psychologist who evaluated Hubbard during her hospital stay, and Dr. Wierson's report indicated that Hubbard's mental impairments were not severe. Similarly, Hubbard tolerated her spinal surgery well, and there was no indication from the records that she suffered any lasting complications or limitations. The medical records also showed that Hubbard's asthma was well controlled with medication, that her complaints of chest pain were not cardiac in nature, and that she showed only mild mitral valve regurgitation. Finally, Dr. Williams's and Dr. Wierson's assessments of Hubbard's physical and mental functioning indicated that Hubbard suffered little or no limitation in daily activities based on her alleged impairments. Overall, substantial evidence support the ALJ's residual-functional-capacity assessment.

For similar reasons, substantial evidence also supports the ALJ's finding that Hubbard's subjective statements regarding the intensity, persistence, and limiting effects of her symptoms were not wholly credible. First, to the extent that Hubbard argues that her history of drug use was irrelevant to her disability claims, her argument is unavailing, as the medical records indicate that substance abuse contributed to or was a suspected cause of several of her medical issues, including her burn wounds, transient ischemic attack, and July 2011 syncopal episode. In addition, the ALJ's determination that Hubbard's subjective testimony lacked credibility was also based on the inconsistencies between the medical records and Hubbard's allegations, which we have reviewed above, and the fact that Hubbard had performed at least some work activity after the alleged onset of disability. Consequently, we find that the ALJ's credibility determination was clearly articulated and supported by substantial evidence. *Mitchell*, 771 F.3d at 782.

In short, our review of the record shows that the ALJ reviewed all of the evidence before her, accorded more weight to some evidence, such as the medical records and the consulting physicians' assessments, and less weight to other evidence, such as Hubbard's subjective testimony, and adequately explained her reasons for doing do. We therefore conclude that substantial record evidence supports the ALJ's conclusion that Hubbard had the residual functional capacity to perform medium work, which, in view of the vocational expert's testimony,

16

allowed Hubbard to perform her past relevant work. *See Winschel*, 631 F.3d at 1178.

## B.

Hubbard also submits numerous medical records along with her brief on appeal to this Court, and she asserts that her condition is worsening. It appears that some of these records were submitted to the ALJ, some were presented to the Appeals Council, some were presented anew before the district court, and some are presented for the first time on appeal. After review of these materials, we conclude that they do not show that Hubbard is entitled to relief.

"We review the decision of the ALJ as to whether the claimant was entitled to benefits during a specific period of time, which period was necessarily prior to the date of the ALJ's decision." *Wilson v. Apfel*, 179 F.3d 1276, 1279 (11th Cir. 1999). The ALJ's decision in this case was rendered on November 30, 2012. Therefore, the medical records from 2013 and 2014, purportedly showing a worsening of Hubbard's conditions, are not relevant to the issues in this appeal,[3] *see id.*, even if they may be relevant should Hubbard file another application for disability benefits based on the period after the conclusion of the agency proceedings in this case, as indicated in the Appeals Council's decision.

---

[3] Nor are records submitted for the first time on appeal properly before this Court. *See Wilson*, 179 F.3d at 1278-79 (noting that our review is limited to the certified record and that evidence attached as an appendix to a brief is not properly before this Court).

17

Regarding the medical records within the relevant period, Hubbard has not shown that these records are "new and material evidence."  *See* 20 C.F.R. § 404.970(b); *see also Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1267 (11th Cir. 2007) (explaining that a district court may remand a case under sentence six of 42 U.S.C. § 405(g) "when new material evidence that was not incorporated into the administrative record for good cause comes to the attention of the district court").  Here, the records relating to the period on or before the date of the ALJ's decision in November 2012 either were submitted to the ALJ and therefore were not new, or they were largely consistent with the other medical evidence, so there is no "reasonable possibility that the new evidence would change the administrative outcome." *Hyde v. Bowen*, 823 F.2d 456, 459 (11th Cir. 1987).

## IV.

Because substantial evidence supports the ALJ's determination that Hubbard was not disabled within the meaning of the Social Security Act for the period of time under consideration, we affirm the Commissioner's denial of disability benefits.

**AFFIRMED.**[4]

---

[4] Hubbard's motion to expedite our consideration of this appeal is DENIED as moot.